```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA


  UNITED STATES OF AMERICA

            vs.                        Criminal No. 20-173

  CHRISTOPHER WEST



                     - - - - -



  Transcript of Proceedings held on February 1, 2021, via
  videoconference, before the Honorable Patricia L. Dodge,
  United States Magistrate Judge.



                     - - - - -


APPEARANCES:

  For the Government:    U.S. Attorney's Office
                         by Shaun E. Sweeney, Esq.


  For the Defendant:     Frank Walker Law
                         by Frank C. Walker, Esq.

                     - - - - -

  Court Reporter:        Deborah Ann Betzler, RPR, FCRR
                         700 Grant Street
                         Suite 6260
                         Pittsburgh, PA  15219



                     - - - - -


    Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.
```

P R O C E E D I N G S

THE CLERK:  This honorable court is now in session. The Honorable Patricia L. Dodge now presiding for the United States District Court, Western District of Pennsylvania.

THE COURT:  Good morning, everyone.  We're here today for a detention hearing in the matter of the United States vs. Christopher West at Docket No. 20-173.  Would counsel enter their appearances, please.

MR. SWEENEY:  Shaun Sweeney here on behalf of the government, Your Honor.  Good morning.

THE COURT:  Good morning.

MR. WALKER:  Frank Walker on behalf of Mr. West.

THE COURT:  Mr. Walker, as you know, with Mr. West's consent, Section 15002 of the CARES Act authorizes the Court to conduct certain initial criminal proceedings by videoconference.  The finding and authorization of that section of the CARES Act are in effect in this judicial district.  Have you had the chance to talk with Mr. West about whether he consents to proceeding here today by videoconference?

MR. WALKER:  I have, Your Honor, and he does consent.

THE COURT:  All right.  Thank you very much.  Then I'll note that this matter comes before the Court on the request of the government to detain Mr. West pending the trial of this matter.  In considering that request, I am guided by

1      certain general principles.  First, at all times, Mr. West is

2      entitled to a presumption of innocence.  Nothing that takes

3      place in this hearing or nothing that I set forth in my

4      findings is intended or should be construed to affect that

5      presumption.  Rather, the purpose of this proceeding is to

6      determine whether, notwithstanding that presumption of

7      innocence, Mr. West should be detained pending trial.

8          I also want to note that I'm guided by the principles of

9      the Bail Reform Act, in which I must consider whether there

10     are conditions or a combination of conditions that will

11     reasonably assure Mr. West's appearance and reasonably assure

12     the safety of others in the community.  The Act requires that

13     I impose the least restrictive conditions that are necessary

14     to provide those reasonable assurances.  If I cannot find any

15     conditions that will reasonably assure the safety of the

16     community or the appearance of Mr. West as required, then I am

17     required to hold that he continue to be held in custody.

18         With that, Mr. Sweeney, are you prepared to proceed?

19             MR. SWEENEY:  I am, Your Honor, and I don't have

20     anything beyond what is set forth in the pretrial services

21     report.  I don't intend to offer any evidence or any

22     witnesses.  I would just like to have the opportunity at the

23     appropriate time to make argument.

24             THE COURT:  All right.  That's fine, Mr. Sweeney.

25         Then, Mr. Walker, let me turn to you.  Do you have any

1    evidence to present during this proceeding today?

2            MR. WALKER:  Yes, Your Honor.  The defense would call

3    Michelle Lefevre, and I don't believe she has -- she may be in

4    the waiting room.

5            THE COURT:  I don't believe she has joined us,

6    Mr. Walker.

7            MR. WALKER:  Okay.

8            THE COURT:  Ms. Eckenrode is indicating that she's

9    not in the waiting room.  So we can certainly provide a few

10   minutes for her to appear, but what I would suggest -- I don't

11   want to hold anyone up, but I certainly want to give you the

12   opportunity to have her appear.  Would you like to try and

13   reach out to her and see if she's having some technical

14   difficulty joining us?  And we can take a five-minute recess

15   for you to be able to do that.

16           MR. WALKER:  Yes, Your Honor.  I'd appreciate that.

17   Thank you.

18           THE COURT:  All right.  She can participate by

19   telephone if she is unable to connect with the video.  So why

20   don't you check with her.  We'll take a short recess.  And

21   when you've been able to reach her, let Ms. Eckenrode know,

22   and then we'll proceed.  All right?

23           MR. WALKER:  Okay.  Thank you.

24           THE COURT:  Okay.  Thank you.

25           THE CLERK:  Court is in recess.

1          (Brief recess was taken.)

2          THE CLERK:  Court is back in session.

3          THE COURT:  We're back on the record.  We've taken a

4    short break.  It looks like, Mr. Walker, your witness is now

5    with us, so you may proceed.

6          MR. WALKER:  Thank you.  Ma'am, can you unmute

7    yourself.

8          THE WITNESS:  Yes, I can.  Hi.

9          THE COURT:  Before she testifies, we'll need to have

10   her placed under oath, Mr. Walker.

11          (Witness sworn.)

12          THE CLERK:  Please state your name and spell it for

13   the court reporter.

14          THE WITNESS:  Michelle Lefevre.  It's

15   M-i-c-h-e-l-l-e.  Lefevre is L as in Lima, E as in Echo, F as

16   in Foxtrot, E as in Echo, V as in Victory, R as in Romeo, and

17   E as in Echo.

18          THE COURT:  All right.  You can proceed, Mr. Walker.

19          MR. WALKER:  Thank you.

20                        **MICHELLE LEFEVRE**

21   having been duly cautioned and sworn, was examined and

22   testified as follows:

23                        DIRECT EXAMINATION

24   BY MR. WALKER:

25   Q.  Ma'am, do you know Mr. West?

1    A.   Yes.

2    Q.   How do you know him?

3    A.   I know him from my previous employment a couple of years

4    ago.

5    Q.   And you understand that we are here for a bond hearing, do

6    you not?

7    A.   Yes.

8    Q.   If released, do you permit Mr. West to stay with you --

9    A.   I do.

10   Q.   -- pending trial?

11        Okay.  Do you know the charges he is facing?

12   A.   Yes.

13   Q.   And who lives in your household?  Without giving any

14   names, who lives in your household?

15   A.   My child on the weekends.  So mainly just me, but my

16   child, too.

17   Q.   And without giving an exact address, what part of town do

18   you live in?

19   A.   I live in Baldwin.

20   Q.   And what type of home is it?

21   A.   It is one of those residential apartment complexes.

22   Q.   If asked, will you have a home line installed if Mr. West

23   needs a home monitoring system?

24   A.   I will.

25   Q.   If asked, will you agree to sign on as a guarantor that

1  Mr. West will appear and abide by all of his bond conditions?

2  A.  I will.  I do.

3  Q.  Are you aware that the federal case he is currently facing

4  could possibly take an additional six months -- six to eight

5  months before proceeding to trial?  Are you aware of that?

6  A.  Yes, I am.

7  Q.  Knowing that, are there any concerns about Mr. West

8  staying with you pending trial?

9  A.  Not at all.

10        MR. WALKER:  I have no further questions, offer for

11  cross.

12        THE COURT:  Mr. Sweeney, any questions?

13        MR. SWEENEY:  Yeah.  Just a few, Your Honor.  Thank

14  you.

15                      CROSS-EXAMINATION

16  BY MR. SWEENEY:

17  Q.  Miss Lefevre, you said that -- did I pronounce your name

18  correctly, Lefevre?

19  A.  You actually did.  I was going to comment, you did it

20  perfectly.

21  Q.  Thanks.  Miss Lefevre, you said you've known Mr. West for

22  how long?

23  A.  It's been since 2019 I met him.

24  Q.  Okay.  And I saw that -- what were the circumstances of

25  your meeting him?

1    A.   Mutual friends, I met him.  I worked --

2    Q.   You said it was in connection with your employment?

3    A.   Yeah.  I worked at Tilden.  It was a bar, after-hours

4    club.

5    Q.   And that's where you met him?

6    A.   Yeah, through mutual friends.

7    Q.   And I think the pretrial services report indicated that

8    you may describe yourself as being his best friend since 2019?

9    A.   Yes.

10   Q.   Or he described you as that?

11   A.   Yeah.  We became very, very close.  So, yes, he is -- he's

12   my brother.  I consider him family, honestly, besides my son.

13   Q.   Has he ever lived with you previously?

14   A.   No.  We just spent a lot -- especially during this COVID

15   stuff, we spent a lot of time together.  But, no, he's never

16   lived with me before.

17   Q.   And was he living with you at the time that he was

18   arrested in connection with these charges?

19   A.   No, not at all.

20   Q.   And when you say you spent a lot of time with him, how are

21   you able to spend time with him?

22   A.   I mean, I'd pick him up.  Like we went hiking with me and

23   my son.  You know what I mean?  We'd hang out.  You know, I go

24   to the gym, so we'd do workouts, too, sometimes.  I'm a

25   bodybuilder.  I mean, I just hung out with him, talked, wrote

 1   music, stuff like that, studio.
 2   Q.  And so you say that -- you describe him more as like being
 3   a brother to you, not a romantic relationship with him?
 4   A.  No.  He is -- actually, I tell my son he's his uncle.  He
 5   loves Hush.  Or Chris.  I'm sorry about that.  But, yes,
 6   Christopher West.
 7   Q.  How old is your son?
 8   A.  He's 11.
 9   Q.  Are you familiar with Mr. West's criminal history and
10   background, his prior convictions?
11   A.  Yes, somewhat.  I mean, I've never really divulged myself
12   into asking details, because it's not one of those things
13   that -- you know.  But, yes, I am aware.
14   Q.  Could you explain to us a little bit about what you know
15   in terms of what his prior convictions have been.
16   A.  I know that there was a few misdemeanors and stuff.  I
17   mean, like I said, I don't know the extent of it.  I know
18   there was something in New York he has going on, a couple
19   things here.  Like I said, I've never really pried or just
20   gone all the way to say, "What did you get charged" -- you
21   know what I mean?  It's not one of those things I was curious
22   enough to find out about, honestly.
23   Q.  Well, if you have an 11-year-old son that stays with you,
24   don't you agree that it would be important for you to know
25   what his prior criminal convictions were?

1    A.  Well, I mean, at this point, yes.  But then, it wasn't one

2    of those things I was like, "Did you get arrested before?"

3    You know what I mean?  It wasn't something that I divulged

4    myself into.  If it's something that he proactively wanted to

5    go in-depth with, he can tell me.  It's not one of those

6    things that I would be like, "Yeah, so what did you do?"  I

7    knew it wasn't anything very serious, because it wasn't like

8    he did an astronomical amount of time.  He's out.  You know

9    what I mean?

10   Q.  Did you know he has a prior conviction for involuntary

11   manslaughter?

12   A.  I did somewhat hear about that, but I heard that -- wasn't

13   that something that wasn't -- like it got dismissed?  I know a

14   lot of those charges got dismissed, correct?

15   Q.  I'm just asking.  I can't answer questions.

16   A.  I'm just saying, from what I heard, like those things got

17   dismissed.  It wasn't something that he really got --

18   Q.  Were you familiar with the fact that he had a prior

19   conviction for aggravated assault?

20   A.  Yes, a little bit.  But, I mean, I thought it was just

21   little things here and there, like little fights possibly.

22   You know what I mean?  I didn't think it was anything that

23   serious, at least from what I know of, from what I'm aware of,

24   being honest with you.

25   Q.  What is your understanding regarding what he's charged

1    with in connection with the pending robbery case in the Court

2    of Common Pleas of Allegheny County?

3    A.   I don't.

4    Q.   You don't know what that case is about?

5    A.   The robbery case?  No, I don't know any -- no, I don't

6    know about a robbery case.  Like I said, I know little things

7    here and there, nothing fully in-depth because I never really

8    asked for details about things.  You know what I mean?  I knew

9    he got charged here and there with things.  It wasn't

10   something that I really divulged myself into finding out.

11   Q.   Do you know that he's charged with -- I'm not asking you

12   to talk to us about any admissions he may have made to you.

13   That's not the purpose of this question.  What I'm trying to

14   get at is:  How familiar are you with the man whom you are

15   willing to have stay at your house with an 11-year-old son?

16   And what I want to you ask you is:  Are you familiar with the

17   fact that he has been charged with aggravated assault and a

18   robbery on a cameraman in connection with the riots this past

19   summer?

20   A.   I didn't know it was in that depth.  No, I didn't know it

21   was a robbery.  I mean, I heard it was something about

22   destroying a camera is what he was allegedly accused of.  But,

23   like I said, I knew it was part of the Black Lives Matter

24   parade.  I don't personally divulge myself in getting into

25   riots and stuff like that, so I want no part of it.

1        But, yeah, I mean, I know kind of what he's getting

2    charged with right now is the whole destruction of private

3    property, correct?  Isn't that what it was, like the whole

4    cameraman thing?  That's what I know.  The robbery part, no, I

5    had no idea about a robbery.

6    Q.  Would it be accurate to say that regardless of what these

7    pending charges are, regardless of what they are, you're still

8    willing to have him stay at your place?

9    A.  I am, because I know him as a person.  He is a good

10   person.  People make mistakes in their past; and as long as

11   they're willing to redeem themselves -- which I do fully

12   believe that my brother is at this point in time -- I'm

13   willing to help him.  So at the moment that I feel like it's

14   not working, guess what?  His probation officer, parole

15   officer -- I don't know who I call, but I will call them.  And

16   guess what?  He will go back to where he came from, because

17   I'm not having that around my child.  You are absolutely

18   correct.

19        The reason I'm doing this is because I do trust him, I

20   love him.  He's always been there for me this almost what?

21   Two years that I've known him.  My son looks up to him

22   musically and respects him as a man.  You know what I mean?

23   He doesn't know his history in that way.  He knows him as a

24   person, and I love him as a person, and I'm going to help him

25   if I can.  Because if I were in his position, I would hope he

1    would do the same for me and trust me enough to do that.

2    So -- sorry.

3    Q.  Do you know when he got arrested in connection with the

4    charges from this summer?

5    A.  Excuse me?

6    Q.  Do you know when he got arrested, when he went into

7    custody, approximately?

8    A.  Wasn't it around August or something, like -- yeah, it was

9    somewhere around there.  Like his girlfriend called me.

10   Q.  So you had known him for less than a year before he went

11   to jail on these charges?

12   A.  I did.  But, like I said, this COVID stuff, it kind of

13   keeps you secluded.  We spent a lot of time together.  I mean,

14   I still worked at the airline, but I had a lot more time.

15   Q.  What do you do now for a living?

16   A.  Currently, I am a dancer.  I got laid off from my

17   restaurant job that was a fine dining restaurant job,

18   actually, this past winter.  So I do dance, though.

19   Q.  Where are you a dancer?

20   A.  It is an agency.  It's a private agency, so we do bachelor

21   parties.  So I'm an entertainer.  We do bachelor parties,

22   birthdays, stuff like that.

23   Q.  I assume that you work nights, then, not during the day

24   usually?

25   A.  Yeah, and I only work three days a week.  So it's like

1   three to four days a week.  Four days is a rarity, but it's

2   three days a week I work, yes.

3   Q.  So when are you gone from the house?

4   A.  6 p.m. to 4 a.m.

5   Q.  6 p.m. to 4 a.m.?  And that's three times a week?

6   A.  Yes.

7   Q.  So Mr. West would be on his own, basically, during those

8   timeframes?

9   A.  I mean, yeah.  I won't be home, so, yes, he would be.  But

10  doesn't he have monitoring, as well?  Just to confirm, though,

11  he's going to have like a monitoring system?

12  Q.  That might be up to pretrial services and the Court.

13  A.  Okay.  I didn't know if that was --

14  Q.  So if you're saying -- Miss Lefevre, if you're saying

15  you're working three nights a week 6 p.m. to 4 a.m., what

16  nights?

17  A.  I usually work -- it's Friday nights, I work -- well, this

18  week -- it varies, honestly.  Like this week I worked

19  Wednesday to Saturday because a girl is in surgery right now.

20  You know what I mean?  But generally it's Monday, Wednesday

21  and Fridays is what I work.  But, like I said, it varies on

22  what's needed, too, when I'm available.

23  Q.  When do you get custody of your son?  How often will your

24  son be there?

25  A.  I get him every weekend.  So from Friday -- I pick him up

1    Friday, and his dad picks him up Sunday.  And if he has Monday

2    off, I'll keep him.  You know what I mean?  If he has other

3    days off, I'll keep him later -- or longer.

4    Q.  So if you're working Friday night, Mr. West would be home

5    alone with your son?

6    A.  I mean, he could be.  If he shouldn't be, I could have

7    somebody here, because my son does have a babysitter, as

8    well.  So I was planning on him being here with Chris; but,

9    I mean, if he needs watched, I can probably finagle

10   something.

11   Q.  Have you talked to your son's father about the fact that

12   Mr. West may be staying there at your residence while your

13   son is there?

14   A.  I mean, I can; but my son's father is currently, as well,

15   on probation.  So I don't think he'd have an issue with it,

16   honestly.  But I will inform him ahead of time once all of

17   this goes through, of course.  Like I said, he is -- yeah.  So

18   I don't think he'll discriminate about him being here with

19   Chris.  Let's just say that.

20           MR. SWEENEY:  Your Honor, that's all the questions I

21   have.  Thank you.

22           THE COURT:  All right.  Thank you.

23      Mr. Walker, is there anything further that you would like

24   to ask?

25           MR. WALKER:  Yes.

REDIRECT EXAMINATION

BY MR. WALKER:

Q.  Miss Lefevre, you mentioned that if he messes up -- he

being Mr. West -- that you would call probation immediately.

Can you give me instances where you think that would become

necessary?

A.  I mean, I don't see him doing anything wrong.  You know

what I mean?  I don't see it being an issue or something that

will have to happen.  But, I mean, if I see him doing anything

illegal, if I see him drinking, if I seem him doing anything

he's not supposed to be doing -- on that paper that shows me

what he's supposed to be doing, not supposed to be doing --

there's going to be a phone call.

    And we've discussed how strict I'm going to be about

this; because, like, as mentioned before, I do have an

11-year-old child that lives with me.  And I'm not risking

losing my son over this, either, but I am willing to help

somebody I consider my brother.  So that's what I'm doing now.

          MR. WALKER:  No further questions.  Thank you.

          THE COURT:  Mr. Sweeney, anything further?

          MR. SWEENEY:  No.  Thank you, Your Honor.

          THE COURT:  All right.  Miss Lefevre, we certainly

appreciate your testimony.  You're excused as a witness, but

you may continue to watch the proceeding if you would like to.

Thank you.

1           THE WITNESS:  Thank you so much for your time.

2           THE COURT:  All right.  Mr. Walker, any other

3    evidence that you wish to present before we turn to oral

4    argument?

5           MR. WALKER:  No, Your Honor.  Just argument.

6           THE COURT:  All right.  Then, Mr. Sweeney, feel free

7    to proceed.

8           MR. SWEENEY:  Thank you, Your Honor.  If you look at

9    the pretrial services report relating to Mr. West's background

10   and history, it's pretty clear that he has not stopped having

11   run-ins with the law since age 14.  He's going to be 36 in a

12   couple weeks.  His issues with the criminal justice system

13   started at age 14, and then in 2004 he had an involuntary

14   manslaughter, an aggravated assault conviction; 2011,

15   resisting arrest and providing false identification to police

16   officers; 2016, simple assault and harassment.

17       And now in 2020 he's charged with robbery, riot,

18   recklessly endangering another person, and also charged with

19   conspiracy to commit arson of a police vehicle.  Your Honor,

20   he has essentially ticked off convictions or at least charges

21   for virtually every type of violent crime, simple assault,

22   aggravated assault, recklessly endangering another person,

23   resisting arrest, robbery, arson.

24       Judge, all of these crimes, I think, clearly demonstrate

25   that Mr. West, unfortunately, has a propensity for violence.

1    Normally when you look at a criminal record, you see somebody

2    who has a bunch of DUIs or somebody who has a bunch of

3    possession of paraphernalia or retail thefts or access device

4    frauds.  He has ticked off every type of violent offense in

5    his history, most recently in 2020.

6         Now, he also has some failures to appear, with respect to

7    his risk of flight.  And when you look at the pretrial

8    services report, they're recommending detention, I believe on

9    both bases, risk of flight and danger to the community.  Now,

10   I get Ms. Lefevre in good faith is trying to help out somebody

11   that she cares about.  I understand wanting to give a second

12   chance to somebody that she's grown close with.  I have no

13   reason to believe that she's making any type of false

14   representations or trying to mislead the Court at all.  I

15   think her heart is in the right place.

16        But, Judge, when you have a situation where you have a

17   man with Mr. West's past involving failures to appear, having

18   charges brought against him where it's at least supported by

19   probable cause, serious charges like burning a police car

20   while he's on probation, it's clear that Mr. West has trouble

21   complying with court orders and court supervision.  And the

22   situation that we're talking about here would be allowing

23   Mr. West to stay at a residence where he would at times be

24   home alone with an 11-year-old boy while the mom is out

25   working.

1          I don't think it's a suitable release plan, and I believe

2     that the government has satisfied its burden that Mr. West is

3     both a danger to the community and a risk of flight to the

4     point that there are no conditions or combination of

5     conditions that would be able to reasonably assure his

6     appearance in court and the safety of the community.

7          THE COURT:  Mr. Sweeney, would you very briefly just

8     review the pending charges against Mr. West in this matter.

9          MR. SWEENEY:  Yes, Your Honor.  He is charged with

10    conspiracy to commit a violation of Title 18,

11    Section 844(f)(1), which is the federal arson statute

12    involving burning of property that is owned by an organization

13    receiving federal funds.  In particular, in this case he's

14    charged with aiding and abetting and conspiring to burn a

15    marked police vehicle during the riots on May 30, 2020.  And

16    he is also charged with unlawful interference and obstructing

17    law enforcement officers stemming from that same thing.  That

18    is by setting fire to a police vehicle.

19         Down the street in the Court of Common Pleas he's charged

20    with robbery, and I believe that's in connection with him

21    allegedly taking the camera off a KDKA cameraman who was

22    filming the riots and the burning of the police vehicle; and

23    he's charged with the offense of riot down the street and

24    recklessly endangering another person, I believe.  Those are

25    the charges that are pending against him right now, Your

1    Honor.

2          THE COURT:  All right.  Thank you very much,

3    Mr. Sweeney.

4       Mr. Walker, I'm happy to hear from you, as well.

5          MR. WALKER:  Thank you, Your Honor.  Your Honor, it's

6    not typical that I am applauding a U.S. Attorney on a cross-

7    examination of one of my witnesses, but Mr. Sweeney did a

8    thorough job of cross-examining the witness to establish any

9    prejudice or anything whatsoever.  But in his cross-

10   examination, Miss Lefevre, she passed all the threshold

11   standards.

12      She stated that, "Yes, he can stay with me; yes, if he

13   messes up, I will call the probation officer, I will do

14   everything I need to do to make sure he is on the right

15   track."  It's not often that witnesses attest to that, and I'm

16   glad she was able to state that.  She is a suitable person as

17   a third-party guarantor.  He has a suitable home plan.  She

18   established that she knows him, she has a relationship with

19   him; her son knows him, has a relationship with him; and she

20   is willing to report him if he messes up.  I believe we've

21   rebutted the presumption because of the third-party guarantor

22   and the fact that he has a place to stay.

23      But the presumption of innocence is the prevailing thing

24   here.  Under 3742, those are the factors that have to be

25   considered.  The presumption of innocence and these factors

1    for the charges he's facing -- he's charged with conspiring to

2    burn a police vehicle pursuant to protests and/or riots, and

3    in the same factor he's charged with taking the camera from

4    the cameraman who was filming the burning of the police car.

5        So obviously there is some factual determinations that

6    will be made at a later date, but at this juncture the two

7    issues are whether or not he is a danger to society and

8    whether or not he is a flight risk.  I don't believe he is a

9    flight risk because there are conditions or a combination of

10   conditions that can rebut that issue with home incarceration,

11   electronic GPS, and he has a place to stay.

12       Now, the second issue would be danger to society.

13   Mr. Sweeney has brought out his history.  All of those factors

14   have been taken into consideration and factored into his prior

15   record score for those offenses.  He has paid his costs and

16   his debt to society for those offenses in the past.  The court

17   in that jurisdiction sentenced him for those crimes in the

18   past.  He did probation, parole, whatever he has needed to do

19   in the past for those conditions.

20       Does that establish a heightened risk of safety for this

21   crime?  I would say no, because he's not charged with a

22   violent involuntary manslaughter or a manslaughter or a

23   homicide or an aggravated assault in this case right here

24   before the Court.  This is an issue of conspiracy for a

25   violation of the Federal Crimes Act with vandalism to a car

1   and conspiracy for the destruction of the car.

2        Your Honor, this isn't, in my eyes, a violent crime for

3   which Mr. Sweeney attests and tries to tie it back to the

4   previous crimes for which he's paid his debt to society.  I

5   believe he has rebutted the presumption, and I believe there

6   is a condition or combination of conditions that would assure

7   the Court that Mr. West would not be a danger to society and

8   would show up for court, Your Honor.  So I'm asking for him to

9   be released on those conditions, which would assure those --

10  which meet those conditions, Your Honor.

11            THE COURT:  Thank you, Mr. Walker.

12        Mr. Sweeney, anything further?

13            MR. SWEENEY:  No.  Thank you, Your Honor.

14            THE COURT:  All right.  Then I'd like to turn now to

15  my findings and conclusions.  In this case the government is

16  seeking detention on multiple grounds and claims that it is

17  entitled to a hearing, as we're having now, based upon the

18  following:  First, that Mr. West has been charged with a crime

19  of violence.

20        Secondly, that there is a serious risk that he will flee

21  and that there is a serious risk that he will obstruct or

22  attempt to obstruct justice.  There is no rebuttable

23  presumption -- this is not a presumption case, so I'm not

24  going to address that factor.

25        I will, however, address the specific factors that the

1   Bail Reform Act requires me to consider.  First, the nature

2   and circumstances of the alleged offenses.  In this case, the

3   offenses, all of which occurred on May 30th of 2020, are

4   conspiracy, the malicious destruction or damage by fire of a

5   police vehicle and obstruction of law enforcement during a

6   civil disorder.  Those, in the Court's view, looking at the

7   nature and circumstances of a civil disorder, the destruction

8   of a law enforcement vehicle, I view as a serious offense.

9       Based upon what has been told to me during this hearing,

10  it appears that it was during a civil disorder that led to

11  some violence, and there are other charges pending for which

12  Mr. West has been charged, although I certainly understand

13  that with respect to all of these charges, there is a

14  presumption of innocence.  However, I do view the nature and

15  the circumstances as serious.

16      Looking at the weight of the evidence, I am primarily

17  guided here by the fact that an indictment was issued

18  against Mr. West which reflects that there was probable

19  cause for the Grand Jury to return a three-count indictment

20  against him.

21      I also want to turn to the third factor, which is the

22  history and characteristics of Mr. West.  And in that regard,

23  I'm relying, in part, on the pretrial services report and

24  would like to review some of the information within that

25  report.  Mr. West is a single 36-year-old male who apparently

1    has been a resident of the Western District for about nine

2    years.  He was unemployed at the time of his arrest last

3    summer, and I will note that there appears to be a very spotty

4    history of any employment on his part.

5       I've reviewed the criminal history of Mr. West.  While I

6    won't go into the juvenile offenses, as Mr. Sweeney pointed

7    out, those did begin at a relatively early age.  But just

8    looking for a moment at the charges for which he either pled

9    or was found guilty since he became an adult, there are a

10   number of them that include aggravated assault and involuntary

11   manslaughter, resisting arrest and providing false

12   identification to a police officer, assault, possession of a

13   controlled substance and, most recently, not only the current

14   charges but the charges that are pending in state court, that

15   being robbery and riot, again from the same date, and criminal

16   mischief and vandalism.

17      I'll note that there have been at least, by my count,

18   three bench warrants issued, one that is still pending in

19   another jurisdiction; and with respect to a 2019 charge of

20   possession of a controlled substance, two bench warrants that

21   were issued.  It also appears that Mr. West was on probation

22   during the present offenses, both in federal and state court.

23      That essentially summarizes the criminal history, and I

24   take that criminal history and the nature of the offenses very

25   much to bear in connection with my decision.  I've also looked

1    at the nature and seriousness of danger to the community or to

2    others and note that many of the offenses charged were violent

3    in nature, including robbery, assault, aggravated assault,

4    resisting arrest and so forth.

5         I will note that I appreciate Ms. Lefevre's appearance

6    here today and her willingness to serve as a third-party

7    custodian.  I have no doubt that she approaches this position

8    with the requisite seriousness and certainly is interested in

9    serving in that role and doing her best.

10        But I've also reviewed the recommendation of pretrial

11   services.  I'll note they note both the risk of nonappearance,

12   including three prior failures to appear, the fact that

13   Mr. West was on probation when this offense occurred, the two

14   other pending cases and the fact that he is not employed and

15   has not been employed in any ongoing way.  With respect to

16   danger to the community, the pretrial services report

17   indicates -- and I agree -- that there were multiple crimes of

18   violence, that there was criminal activity while he was under

19   supervision.

20        And so, again, while I appreciate Ms. Lefevre's

21   willingness to assist the court, her appearance here today,

22   based upon the evidence, based upon the nature of the

23   offenses, the prior criminal history and other matters that I

24   raised regarding the matters that I'm required to consider,

25   based upon all of this, I find that by clear and convincing

1    evidence there are no conditions that will reasonably assure

2    the safety of others and by a preponderance of the evidence

3    that there is no condition that will reasonably assure

4    Mr. West's appearance.

5         Therefore, based upon the forgoing, I am ordering

6    Mr. West to continue to be detained pending the trial of

7    this matter.  Again, I appreciate Ms. Lefevre's willingness

8    to serve as a third-party custodian but find that that would

9    not provide the reasonable assurances that are necessary for

10   me to order release.

11        Is there any other matter that counsel wish to address

12   during this proceeding?

13             MR. SWEENEY:  Nothing from the government.

14             MR. WALKER:  No, Your Honor.

15             THE COURT:  All right.  Thanks to all for your

16   attendance.  I certainly appreciate your arguments and matters

17   that you presented.  It was very helpful to me.  And with

18   that, we are concluded.

19             THE CLERK:  Court is adjourned.

20             (The above-captioned matter was concluded.)

21                       - - - - -

22

23

24

25

I N D E X

WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

Michelle Lefevre          5       7        16        --

- - - - -


C E R T I F I C A T E

         I, DEBORAH ANN BETZLER, RPR, FCRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-entitled case.



s\ Deborah Ann Betzler                02/28/2021
DEBORAH ANN BETZLER, RPR, FCRR        Date of Certification
Official Court Reporter